Argued and submitted May 20, 2010, affirmed February 23, petition for review allowed July 22, 2011 (350 Or 532)

**STATE OF OREGON,**
acting by and through the Oregon State Treasurer,
and the Oregon Public Employee Retirement Board,
on behalf of the Oregon Public Employee Retirement Fund,
*Plaintiff-Appellant,*

*v.*

**MARSH & McLENNAN COMPANIES, INC.**
and Marsh, Inc.,
*Defendants-Respondents,*

*and*

Jeffrey GREENBERG
and Ray Groves,
*Defendants.*

Multnomah County Circuit Court
050808454; A139453

250 P3d 371

Scott A. Shorr argued the cause for appellant. With him on the briefs were Keith A. Ketterling, Joshua L. Ross, and Stoll Stoll Berne Lokting & Shlachter P.C., Special Assistant Attorneys General.

James T. McDermott argued the cause for respondents. With him on the brief were Dwain M. Clifford and Ball Janik LLP.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Investment managers retained by the State of Oregon purchased stock, on behalf of the Oregon Public Employee Retirement Fund (OPERF), in an insurance consulting and brokerage firm called Marsh & McLennan. After most of the purchases had occurred, the Attorney General of New York announced that Marsh & McLennan executives had pled guilty to criminal charges relating to various corporate misdeeds. Marsh & McLennan shares immediately fell; according to the state, the decline in value cost OPERF approximately $10 million. The state subsequently brought this action alleging that the $10 million loss resulted from, among other things, Marsh & McLennan's violations of Oregon securities laws, ORS 59.135 (prohibiting fraud and misrepresentation in security transactions), and ORS 59.137 (creating cause of action for violating ORS 59.135).[1] The trial court granted Marsh & McLennan's motion for summary judgment on the ground that the state failed to provide evidence from which a jury could find that OPERF's agents had purchased the stock in reliance on Marsh & McLennan's fraudulent misrepresentations, and that reliance was a necessary element of a claim under ORS 59.137. Additionally, the trial court concluded that Oregon's statute was unconstitutional because it unduly interfered with Congress's power to regulate interstate commerce. We agree with the trial court's ruling on reliance, and we therefore affirm without reaching the constitutional issue.

This case has already had a long procedural history. The state filed its complaint in 2005, alleging that Marsh & McLennan and one of its subsidiaries, Marsh, Inc. (hereafter collectively "Marsh"), had engaged in a fraudulent scheme perpetrated by means of false and misleading statements.[2]

---

[1] The statutes are set out below, 241 Or App at 111. Although ORS 59.135 describes security-related conduct that is unlawful, ORS 59.137 incorporates that conduct and makes it the basis for private causes of action. We therefore refer to the elements of a cause of action under ORS 59.137, even though the conduct at issue is defined in ORS 59.135.

[2] The complaint also named two individual Marsh executives as defendants. The individual defendants have been dismissed from the case and are not part of this appeal.

According to the complaint, Marsh presented itself as an honest broker in the business of helping people and corporations devise an insurance plan, solicit bids from competing insurers, and purchase the best plan at the best rates. Instead, the state alleged, Marsh collected hundreds of millions of dollars annually under "contingent commission agreements" with insurance companies; these payments

> "represented little more than kickbacks, in return for which Marsh agreed to direct business to insurance companies on a non-competitive basis, rig bids, and fix prices. In return for the kickbacks, Marsh predetermined the 'winning' policy. It then solicited phony and artificially high 'competing' bids from other insurance companies. The insurance companies that provided the phony inflated bids knew that they would be the designated winner for a subsequent policy placement. Marsh's clients were deceived into believing their insurance premiums were set with a fair and competitive bidding process. Marsh's investors were deceived into believing that Marsh's financial results did not depend on unethical and illegal business practices."

The state alleged that, in order to deceive its investors, including OPERF, Marsh published false and misleading statements on its website and in official documents regarding its business ethics, the nature of the "contingent commission agreements," and the source of its income (stated source, legitimate services provided; actual source, kickbacks). The complaint also alleged that OPERF relied on the misrepresentations and that "senior officers and directors" of Marsh knew of the fraudulent scheme and knew that it had not been disclosed to the public. Finally, the complaint alleged that Marsh shares fell from a price of $46.13 per share at close of business on the day before the Attorney General of New York made public the results of his investigation into Marsh's practices, to a price of $29.20 by close of business two days later.

■■ Marsh attempted unsuccessfully to remove the case to federal court. Upon remand to Multnomah County Circuit Court, Marsh filed a motion to dismiss, raising several arguments. First, it contended that plaintiff failed to allege facts sufficient to state a cause of action under ORS 59.137(1). That statute provides:

"Any person who violates or materially aids in a violation of ORS 59.135 (1), (2) or (3) is liable to any purchaser or seller of the security for the actual damages caused by the violation * * * unless the person who materially aids in the violation sustains the burden of proof that the person did not know and, in the exercise of reasonable care, could not have known of the existence of the facts on which the liability is based."

ORS 59.135, in turn, provides:

"It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security or the conduct of a securities business or for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise:

"(1) To employ any device, scheme or artifice to defraud;

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

"(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; or

"(4) To make or file, or cause to be made or filed, to or with the Director of the Department of Consumer and Business Services any statement, report or document which is known to be false in any material respect or matter."

In its motion to dismiss, Marsh argued that the state failed to plead two necessary elements to a violation of ORS 59.137: reliance and *scienter*. According to Marsh, the complaint did not allege facts demonstrating that OPERF had purchased shares of Marsh stock in reliance on any misrepresentations or omissions, and it did not allege facts demonstrating that Marsh's misrepresentations or omissions, had there been any, were intentional. In the alternative, Marsh argued that, if Oregon's security regulation statutes did *not* require reliance or *scienter*, the statutes were unconstitutional because

they imposed more onerous duties on stock issuers than were imposed by federal and other states' securities laws.[3]

In its response, the state disputed Marsh's statutory and constitutional arguments. It maintained that ORS 59.137 created a cause of action that could be maintained without reliance and that, in any event, the complaint pleaded both actual reliance and reliance based on the so-called "fraud on the market" or "efficient market" theory, that is, the theory that the price of a security is based on publicly available information, and material misrepresentations therefore artificially distort a security's price, thereby establishing indirect or second-order reliance. *See Basic Inc. v. Levinson*, 485 US 224, 247, 108 S Ct 978, 99 L Ed 2d 194 (1988). The state also maintained that Marsh could be liable under ORS 59.137 even if its violations of ORS 59.135 were unintentional, that is, that there was no *scienter* requirement—but that, in any event, the complaint sufficiently pleaded that responsible corporate officers did have the necessary degree of *scienter*. Regarding the constitutional issues, the state maintained that its security laws are even-handed regulations of transactions involving Oregon residents, that the statutes do not interfere with federal laws, and that the burden that the state laws impose on interstate commerce is not excessive in relation to the legitimate benefit that the laws conferred on Oregonians.

---

[3] Throughout this litigation, the parties have presented the constitutional question as though it implicates only the so-called "dormant" commerce clause. That clause has no bearing on defendant's argument that Oregon's laws conflict with federal law. An argument that a state law conflicts with federal law, intrudes into an exclusively federal subject, or stands as an impediment to achieving the purpose of the federal law is a *preemption* argument based on an asserted violation of the Supremacy Clause, Article VI of the United States Constitution, and applying an analysis to which neither party refers. *E.g., Pacific Gas & Elec. Co. v. State Energy Resources Comm'n*, 461 US 190, 103 S Ct 1713, 75 L Ed 2d 752 (1983). The dormant commerce clause, on the other hand, prohibits states from enacting laws that impinge on the free trade values embodied in the Commerce Clause, where Congress has *not* exercised its commerce power—that is, when the power is present but "dormant."

Marsh also contended that none of its statements regarding contingent commission agreements were false and that none of its other alleged acts or misrepresentations were "actionable." The court granted summary judgment on purely legal grounds without reaching those issues, and they are not contested on appeal.

The trial court denied the motion to dismiss. The court agreed with the state that it did not have to plead and prove *scienter*, but the court agreed with Marsh that the state did have to plead reliance and had not adequately done so. The court noted,

> "To a certain extent plaintiff has pled reliance in that it can be 'inferred' from the lengthy general summary. However, specific facts will need to be pled making clear who * * * relied on which statements or documents and made the purchase decision in order for the defense to decide on the content of their answer.

> "Thus, I am requiring that reliance be more specifically pled, denying the motion to dismiss[.]"

The court did not reach plaintiff's argument that reliance could be presumed under the efficient market theory, nor did it rule on the constitutional issues.

Thereafter, the state filed an amended complaint with several new paragraphs explaining the efficient market theory and also alleging that, had "Oregon's money managers been aware" of Marsh's unlawful activities, they "would not have made the purchases of [Marsh] stock." Marsh answered and, after some discovery, the case proceeded to summary judgment.

Apparently accepting the trial court's ruling that the state was not required to allege or prove *scienter*, Marsh reiterated its contention that this feature of Oregon's statutes makes them unconstitutional, because imposing strict liability for misrepresentations on companies that traded on a national exchange would require those companies to meet a standard that conflicts with federal law and, potentially, with the laws of other states, thereby unduly burdening interstate commerce. Marsh also reiterated its argument that ORS 59.137 requires reliance and added the argument that the state, after appropriate discovery, had failed to produce evidence of that element as required by the trial court's order on the motion to dismiss. The state reprised its argument defending the statutes' constitutionality. Regarding reliance, the state contended that it had presented some evidence of actual reliance; for the most part, however, the state emphasized the efficient market rationale. The trial court

ruled in favor of Marsh on the constitutional and reliance issues. This appeal ensued.

We begin with the subconstitutional question—reliance—and we do so for two reasons. First, for prudential reasons, we should, when possible, refrain from passing constitutional judgment on the work of a coequal branch; if the state has failed to create an issue of material fact with respect to one of the elements of its claim, the constitutional question simply does not arise. *Leo v. Keisling*, 327 Or 556, 560, 964 P2d 1023 (1998). Second, for practical and logical reasons, we cannot gauge a statute's constitutionality until we determine what it means.

■ The state's primary argument regarding reliance is textual: Neither ORS 59.135 nor ORS 59.137 contains an express reliance requirement. That fact alone, the state maintains, should end the inquiry, because reading a reliance requirement into the statutes would violate ORS 174.010, which mandates that, "[i]n the construction of a statute, the office of the judge is * * * not to insert what has been omitted[.]" Turning to context, the state notes that this court has held that a related statute, ORS 59.115, has no reliance requirement. That statute creates a cause of action for purchasers of stock who are damaged by misrepresentations in face-to-face securities transactions (as opposed to transactions occurring on an exchange).[4] *Everts v. Holtmann*, 64 Or App 145, 152-53, 667 P2d 1028, *rev den*, 296 Or 120 (1983). "It follows," the state argues,

---

[4] ORS 59.115 provides, in part:

"(1) A person is liable as provided in subsection (2) of this section to a purchaser of a security if the person:

"(a) Sells or successfully solicits the sale of a security, other than a federal covered security, in violation of the Oregon Securities Law or of any condition, limitation or restriction imposed upon a registration or license under the Oregon Securities Law; or

"(b) Sells or successfully solicits the sale of a security in violation of ORS 59.135(1) or (3) or by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."

"that if a claim under ORS 59.115 for a violation of ORS 59.135 does not require proof of reliance, a nearly identical claim under ORS 59.137 for a violation of ORS 59.135 also does not require proof of reliance. * * * There is a presumption that the legislature enacts similar statutes in a manner consistent with interpretations of existing statutes."

(Footnote omitted.)

The state's arguments have some force, but we are not persuaded. It is true that neither ORS 59.135 nor ORS 59.137 uses the word "reliance." However, the offense for which liability is imposed in this case is defined repeatedly as a form of fraud or in other terms that necessarily imply reliance:

"It is unlawful * * *:

"(1) To employ any device, scheme or artifice to *defraud*;

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not *misleading*;

"(3) To engage in any act, practice or course of business which operates or would operate as a *fraud* or *deceit* upon any person[.]"[5]

ORS 59.135 (emphasis added). "Fraud" is a term of art naming a common-law cause of action. We presume that the legislature intends such terms to carry their specialized meaning, *Tharp v. PSRB*, 338 Or 413, 423, 110 P3d 103 (2005), and, as a common-law cause of action, fraud necessarily requires reliance, *Conzelmann v. N. W. P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950); *Morasch v. Hood*, 232 Or App 392, 222 P3d 1125 (2009). "Deceit" is also a common-law tort with a reliance requirement. *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 405, 737 P2d 595 (1987). In non-technical usage, an act is not *deceit* unless somebody is *deceived*; deception cannot occur in a vacuum. Likewise, to *mislead* is "to lead in a wrong direction or into a mistaken action or belief." *Webster's Third New Int'l Dictionary* 1444

---

[5] ORS 59.135(4), quoted above, 241 Or App at 111, does not use terms indicating reliance. However, the state does not allege a violation of subsection (4).

(unabridged ed 2002). One cannot "lead" without "leading" something or somebody else. Thus, although the statutory text does not contain the word "reliance," it nonetheless implies that, in order to prove a violation, a purchaser must demonstrate fraud, deceit, or misleading, all of which require reliance.

This court's *Everts* opinion, declaring that a related statute, ORS 59.115, contains no reliance requirement, does not undercut our conclusion that ORS 59.135 does contain one. *Everts* focused on paragraph (1)(b) of ORS 59.115, and held only that that subsection did not contain a reliance requirement: "ORS 59.115(1)(b) imposes liability without regard to whether the buyer relies on the omission or misrepresentation." *Everts*, 64 Or App at 152. It is true that the current version of ORS 59.115(1)(b) imposes liability for "the sale of a security *in violation of ORS 59.135(1) or (3)* or by means of an untrue statement," and, for that reason, might be seen as also incorporating the reliance-laden language of ORS 59.135. However, the italicized language was not part of ORS 59.115(1)(b) when *Everts* was decided. At that time, ORS 59.115(1)(b) imposed liability on any person who "[o]ffers or sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made * * * not misleading * * *." The phrase "in violation of ORS 59.135(1) or (3)" was not added until 2003. Or Laws 2003, ch 631, § 1; Or Laws 2003, ch 786, § 1. Thus, the statute that *Everts* construed—unlike the statute that we construe in this case—did not contain, incorporate, or refer to the terms "fraud," "fraudulent," "deceit," or "misleading."

Finally, we note that the legislative history of ORS 59.137 supports the existence of a reliance requirement. The testimony before committees considering the bills that ultimately became ORS 59.137[6] contains repeated statements

---

[6] ORS 59.137 began in the Senate as Senate Bill (SB) 609 (2003). After it passed, "the securities defense and corporate bar contended that Senate Bill 609 may have had certain unintended consequences to which they objected." Testimony, House Committee on Rules and Public Affairs, HB 3666, Aug 14, 2003, Ex B (statement of N. Robert Stoll, Scott Shorr, Joseph Arellano, and Andrew Morrow). A slightly different version of SB 609—House Bill 3666 (2003)—was then introduced in the House of Representatives, ultimately passed, and was subsequently codified as ORS 59.137.

that the target of the statute is "fraud" or "fraudulent" conduct; nearly every person who testified used one or another of those terms.[7] More directly, the administrator of the state's Department of Consumer and Business Services, Division of Finance and Corporate Securities, testified that one of the purposes of the statute was to ensure that "investors * * * have the right to bring so-called 'fraud on the market' lawsuits when they buy stock on the open market *in reliance on financial statements and similar information* that turn out to have been fraudulent." Testimony, Senate Committee on Business and Labor, SB 609, Apr 7, 2003, Ex K (statement of Floyd G. Lanter) (emphasis added).

The state also contends that, under *Affiliated Ute Citizens v. United States*, 406 US 128, 92 S Ct 1456, 31 L Ed 2d 741 (1972) (*Ute*), it need not show reliance because, when securities fraud results from an *omission* to state a material fact, the defrauded individual need show only that, if he or she had known of the omitted fact, no purchase would have been made. Here, the state contends, Marsh's violation of ORS 59.135 consisted of an omission—failure to disclose illegal activities—and the state's investment managers testified that, had they known of those illegal activities, they would not have bought Marsh stock.

■ We conclude that *Ute* does not relieve the state of proving reliance in this case. First, *Ute* involved the application of federal Rule 10b-5, and, although that rule and ORS 59.135 (and, therefore, ORS 59.137) are "related," they are not identical and federal court interpretations of Rule 10b-5 are, obviously, not binding on us.[8] One reason for that is that

---

[7] Testimony, Senate Committee on Business and Labor, SB 609, Apr 7, 2003, Ex H (statement of Scott A. Shorr), Ex I (statement of Sen Kate Brown), Ex J (statement of Assistant Attorney General Frederick M. Boss), Ex K (statement of Floyd G. Lanter), Ex L (statement of Roger Martin); Testimony, Senate Committee on Business and Labor, SB 609, Apr 28, 2003, Ex A (statement of Scott A. Shorr); Testimony, House Committee on Judiciary, SB 609, May 16, 2003, Ex I (statement of Scott A. Shorr), Ex J (statement of Floyd G. Lanter); Testimony, House Committee on Rules and Public Affairs, HB 3666, Aug 14, 2003, Ex A (statement of Gary I. Grenley), Ex B (joint statement of N. Robert Stoll, Scott A. Shorr, Joseph Arellano, and Andrew Morrow); Testimony, Senate Committee on Rules, HB 3666, Aug 21, 2003, Ex I (joint statement of N. Robert Stoll, Scott A. Shorr, Joseph Arellano, and Andrew Morrow), Ex L (statement of State Treasurer Randall Edwards).

[8] "Rule 10b-5," 17 CFR § 240.10b-5, was promulgated under the authority of 15 USC section 78j(b). It provides, in part:

the United States Supreme Court, unlike this court, interprets securities statutes " 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' " *Ute*, 406 US at 151 (quoting *SEC v. Capital Gains Research Bureau*, 375 US 180, 186, 84 S Ct 275, 11 L Ed 2d 237 (1963)). In particular, the Court in *Ute* followed what it believed to be "congressional philosophy and purpose." *Id.* This court, in contrast, construes statutes relying on text, context and, on occasion, legislative history, *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009)—and the legislature whose history we examine is not Congress.

Second, *Ute* is factually distinguishable. In that case, two bank officials had the responsibility of overseeing the sale of securities by a group of mixed-blood members of the Ute tribe. The officials then bought shares of securities themselves, in face-to-face transactions with sellers, for less than the shares were worth, without disclosing to the plaintiffs the true value. *Ute*, 406 US at 151-53. The Court of Appeals for the Tenth Circuit held that the individuals did not violate Rule 10b-5 because the sellers did not rely on any misrepresentations that the buyers had made. The Supreme Court reversed, holding that "the Court of Appeals erred when it held that there was no violation of the Rule unless the record disclosed evidence of reliance on material fact misrepresentations" by the individuals. *Id.* at 152.

"The defendants may not stand mute while they facilitate the mixed-bloods' sales to those seeking to profit in the non-Indian market the defendants had developed and encouraged and with which they were fully familiar. The

---

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"\* \* \* \* \*

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,

"\* \* \* \* \*

"in connection with the purchase or sale of any security."

The parties agree that ORS 59.135 is modeled on Rule 10b-5. *See Held v. Product Manufacturing Company*, 286 Or 67, 71, 592 P2d 1005 (1979) ("ORS 59.135 is similar to federal Rule 10b-5.").

sellers had the right to know that the defendants were in a position to gain financially from their sales and that their shares were selling for a higher price in that market.

"Under the circumstances of this case, *involving primarily a failure to disclose*, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."

*Id.* at 153-54 (citations omitted; emphasis added).

The present case, unlike *Ute*, does not involve an active, face-to-face omission in a situation in which the defrauded party could be expected to rely on an agent charged with a lawful and specific duty to disclose. More importantly, this case does not "involv[e] primarily a failure to disclose." In *Ute*, the defendants omitted disclosure of a fact that bore directly on the transaction; in the present case, the "omission" is failure to disclose an unlawful scheme of kickbacks and bid-rigging. This case, in other words, involves primarily an "act, practice or course of business which operates or would operate as a fraud or deceit upon any person," ORS 59.135(3), and not an "omi[ssion] to state a material fact necessary in order to make the statements made * * * not misleading," ORS 59.135(2). The plaintiff in an action under ORS 59.137 cannot avoid the reliance requirement by the expedient of recasting an allegation of corporate crimes as a failure to disclose the existence of corporate crimes. *See Beck v. Cantor, Fitzgerald & Co., Inc.*, 621 F Supp 1547, 1556 (N D Ill 1985) (rejecting *Ute* because, through clever pleading, "[e]very fraud case based on material misrepresentation [can] be turned facilely into a material omissions case").

Without abandoning its claim that reliance is not necessary, the state advances the fallback argument that it has presented evidence from which a jury could find that the state did, in fact, rely on Marsh's misrepresentations. The state on appeal does not claim actual reliance; it does not claim that its investment managers were influenced by the allegedly false or misleading documents. Rather, it relies on

the theory that, in a securities fraud case, reliance is presumptively implied by virtue of the so-called "efficient market" theory. That theory was first elaborated in *Basic Inc.*, 485 US at 247:

> "[W]here materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed. * * * An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."

(Footnotes omitted.) In arguing against Marsh's summary judgment motion, the state maintained that, "[i]f reliance is to be incorporated from federal 10b-5 case law, as defendants assert, the 'presumption of reliance' that has been presumed within that federal law for over thirty years also must be incorporated." The trial court rejected that argument. On appeal, we do as well.

As explained above, we conclude that ORS 59.137 contains a reliance requirement based, not on federal case law interpreting Rule 10b-5, but on our interpretation of *Oregon* securities law. Unlike the Supreme Court in *Basic Inc.*, Oregon courts do not subscribe to any particular economic theory, including one that is based on the highly contested premise that markets untainted by misinformation are efficient or, more precisely, that sophisticated participants in securities markets believe that they are. *See* Lynn A. Stout, *Are Stock Markets Costly Casinos? Disagreement, Market Failure, and Securities Regulation*, 81 Va L Rev 611, 649 (1995) ("[E]fficient market theory is suffering a near-death experience." (Internal quotation marks and footnote omitted.)) As we did in determining that ORS 59.137 contains a reliance requirement, in examining the question of the efficient market theory, we rely on the text, context, and legislative history of the Oregon statute.

Nothing in the text or context of ORS 59.137 states or implies the existence of an efficient market presumption to

replace actual reliance. Nor does the state claim otherwise. Rather, it relies on the legislative history. Reviewing the same data, we come to a different conclusion.

It is true, as the state argues, that several of the witnesses before legislative committees considering what was to become ORS 59.137 refer to the "fraud on the market" theory. One proponent submitted the following written testimony:

> "Currently, OPERS may not be able to bring a claim under the Oregon Securities Law against a fraudulent corporation, such as Enron, unless OPERS purchased the securities directly from Enron or in a new offering. The new proposed [ORS 59.137] would permit OPERS to bring a claim when it purchased the securities in the open market where most securities are purchased. * * *

> "Currently, there is conflicting case law * * *. Some cases hold that an investor may only state a claim against a fraudulent corporation if the investor purchased a security directly from that corporation. * * * SB 609 [which, with some modifications that are not relevant to the issues in this case, became ORS 59.137] clarifies and extends the Oregon Securities Laws to allow an investor which is damaged by fraud to recover its losses when the investor purchased its stock in the 'open market.' The amendment would allow for so-called 'fraud on the market' claims and would make Oregon law consistent with the corresponding federal statute that allows for such claims."

Testimony, Senate Committee on Business and Labor, SB 609, Apr 7, 2003, Ex H (statement of Scott A. Shorr). We believe that a legislator perceiving that testimony would not understand the term "fraud on the market" to embody a presumption of an efficient market so as to relieve an investor of proving reliance. Rather, the term is used to explain the primary purpose of the new statute: to provide a cause of action for investors who are defrauded when they purchase securities in non-face-to-face transactions, as they normally do in an "open market" purchase on a stock exchange.

The same conclusion applies to testimony by then-Senator Kate Brown. She wrote,

> "SB 609 clarifies and extends the Oregon Securities Law. Currently, state funds may not be able to bring a

claim against a fraudulent corporation unless the state fund purchased securities directly from the corporation or in a new offering. SB 609 allows defrauded investors to recover damages when investors purchase stock in the 'open market.'

"* * * * *

"SB 609 allows for these 'fraud on the market' claims and would make Oregon law consistent with the federal statutes that allows for these claims."

Testimony, Senate Committee on Business and Labor, SB 609, Apr 7, 2003, Ex I (statement of Sen Kate Brown). Senator Brown described purchases on the open market as opposed to face-to-face transactions, and referred to "these 'fraud on the market' claims." Clearly, she used the term to refer to open market transactions; nothing indicates that she used the term to imply a presumption of reliance. Likewise, the testimony of the Administrator of the Division of Finance and Corporate Securities indicates only that the term " 'fraud on the market' lawsuits" refers to non-face-to-face transactions: "We also believe investors should have the right to bring so-called 'fraud on the market' lawsuits when they buy stock on the open market in reliance on financial statements and similar information that turn out to have been fraudulent." Testimony, Senate Committee on Business and Labor, SB 609, Apr 7, 2003, Ex K (statement of Floyd G. Lanter).

The state cites precedent for the proposition that, when the legislature uses a term of art such as "fraud on the market," it is presumed to invoke the specialized meaning. *Tharp*, 338 Or at 423. We agree. *See* 241 Or App at 115-16. However, the legislature did *not* use the term "fraud on the market"; witnesses did, and there is no indication that any member of the legislature who heard the term was aware of its specialized meaning.

In sum, we conclude that the trial court did not err in granting Marsh's motion for summary judgment. To survive that motion relative to its claim under ORS 59.137, the state had to present evidence that it had purchased Marsh stock in

actual reliance on Marsh's violations of ORS 59.135. The state did not do so.

Affirmed.[9]

---

[9] Our resolution of this case does not address at least two issues, and we express no opinion on either. First, we do not decide whether the plaintiff in a claim under ORS 59.137 needs to prove *scienter*. At the motion to dismiss stage, the trial court decided that such a showing is not necessary, and neither party disputed that conclusion on summary judgment or on appeal. It remains very much an open question. Relatedly, we do not decide whether ORS 59.137 violates the constitution—"relatedly," because the answer to that question turns, at least partly, on the answer to the *scienter* issue; Marsh's constitutional challenge is premised on the assumption that, because Oregon's statutes do not impose a *scienter* requirement, they impose more onerous duties on securities issuers than the federal law or the laws of other states. If there is *scienter* requirement, then that particular constitutional challenge disappears.