STATE OF OREGON,
acting by and through
the Oregon State Treasurer, and the
Oregon Public Employee Retirement Board,
on behalf of the
Oregon Public Employee Retirement Fund,
*Plaintiff-Appellant,*

*v.*

MARSH & McLENNAN COMPANIES, INC.
and Marsh, Inc.,
*Defendants-Respondents,*

*and*

Jeffrey GREENBERG
and Ray Groves,
*Defendants.*

Multnomah County Circuit Court
050808454; A139453

346 P3d 504

Joshua L. Ross argued the cause for appellant. With him on the briefs were Scott A. Shorr and Keith A. Ketterling, Special Assistant Attorneys General; and Stoll Stoll Berne Lokting & Shlachter P.C. With him on the supplemental briefs on remand were Frederick M. Boss, Deputy Attorney General, Anna M. Joyce, Solicitor General, Denise G. Fjordbeck, Attorney-in-Charge, Civil/Administrative Appeals, Matthew J. Lysne, Senior Assistant Attorney General; Keith A. Ketterling, Keith S. Dubanevich, Scott A. Shorr, Special Assistant Attorneys General; and Stoll Stoll Berne Lokting & Shlachter P.C.

James T. McDermott argued the cause for respondents. With him on the briefs were Dwain M. Clifford and Ball Janik LLP. With him on the supplemental briefs on remand was Dwain M. Clifford.

Before Duncan, Presiding Judge, and Armstrong, Judge, and Schuman, Senior Judge.

DUNCAN, P. J.

## DUNCAN, P. J.

In *State Treasurer v. Marsh & McLennan Companies, Inc.*, 241 Or App 107, 250 P3d 371 (2011) (*Marsh I*), we held that a stock purchaser seeking to recover under ORS 59.137 for securities law violations must prove direct reliance rather than utilize a presumption of reliance under the "fraud-on-the-market" doctrine recognized under federal securities law. The Supreme Court subsequently reversed our decision, concluding that the Oregon legislature intended to incorporate the fraud-on-the-market doctrine when it enacted ORS 59.137. *State Treasurer v. Marsh & McLennan Companies, Inc.*, 353 Or 1, 23, 292 P3d 525 (2012) (*Marsh II*). The Supreme Court then remanded the case to us to consider two questions that, because of our rejection of the fraud-on-the-market doctrine, we had not reached in *Marsh I*. The first is whether, on the summary judgment record, defendants successfully rebutted any presumption of reliance. The second is whether, as applied to defendants, ORS 59.137 is unconstitutional because it does not require plaintiff to prove *scienter*—that is, that defendants acted with a guilty state of mind when they made the alleged misrepresentations. For the reasons that follow, we hold (1) that there are genuine issues of material fact with regard to whether defendants rebutted the presumption of reliance; and (2) ORS 59.137 includes a *scienter* requirement and is not unconstitutional as applied to defendants. Accordingly, we reverse the trial court's grant of summary judgment and remand for further proceedings.

## I. BACKGROUND

This case arises under the Oregon Securities Law, ORS chapter 59. Plaintiff is the State of Oregon, acting by and through the Oregon State Treasurer, and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund (OPERF) (collectively, "the state"). In its complaint, the state alleged that defendants Marsh & McLennan Companies, Inc. and Marsh, Inc. (collectively, "Marsh") violated ORS 59.135 by making false and misleading statements that caused the state to lose approximately $10 million on investments in Marsh stock, and that those defendants were therefore liable under ORS

59.137. The Supreme Court summarized those claims in *Marsh II*:

> "The state's amended complaint alleges that the state purchased more than $15 million of common stock in [Marsh & McLennan Companies, Inc. (MMC)] in the open market on the New York Stock Exchange (NYSE) in 2003 and 2004. The state further alleges that the MMC shares are traded on an efficient securities market, that the price of MMC shares traded on the NYSE during 2003 and 2004 reflected the material information that Marsh disclosed to the market, and that the price of MMC shares was artificially inflated because of misrepresentations made by Marsh. The state contends that Marsh made three types of misrepresentations: falsely representing that Marsh had complied with a strict ethical code of conduct; misrepresenting the nature of contingent commission agreements that Marsh had with brokers; and concealing the fact that MMC's reported financial results had been achieved through unethical and illegal business practices. The state's complaint further alleges that the state's money managers who purchased MMC stock had no reason to know of those misrepresentations and would not have purchased the MMC stock at the price paid had they known of those misrepresentations. Finally, the state asserts that the misrepresentations were brought to light through an investigation by the New York Attorney General and that, once the misrepresentations were disclosed in October 2004, the price of MMC stock declined some 37 percent causing the state to lose approximately $10 million in damages."

*Marsh II*, 353 Or at 4.

The trial court granted summary judgment in favor of Marsh on all of the state's claims. The court's ruling was based on two alternative grounds. First, the court ruled that, as applied to Marsh, ORS 59.137 was unconstitutional under the so-called dormant Commerce Clause, insofar as the state was not required to prove that Marsh acted with *scienter*. Second, the court ruled that the state had failed to prove the element of reliance, in part because the state was not entitled to a rebuttable presumption of reliance under a "fraud-on-the-market" theory. In short, that doctrine

> "refers to a rebuttable presumption establishing the reliance element in securities fraud cases that was addressed

and accepted by the United States Supreme Court in *Basic Inc. v. Levinson*, 485 US 224, 247, 108 S Ct 978, 99 L Ed 2d 194 (1988). The doctrine is grounded in the theory that the price of a security traded on the open market is based on publicly available information and that material misrepresentations therefore artificially distort a security's price, thereby establishing indirect or second-order reliance by a purchaser of the security, even if that purchaser did not rely on the misrepresentations directly."

*Marsh II*, 353 Or at 3 n 1. The trial court ruled that the state failed to prove reliance under the fraud-on-the-market theory, both because the doctrine is not available under Oregon law and because, in any event, Marsh had rebutted the presumption.

In *Marsh I*, we affirmed the trial court on the narrow grounds that the state had not produced any evidence of direct reliance and that Oregon law does not recognize a presumption of reliance under the fraud-on-the-market doctrine. We did not address whether, if that doctrine were available, Marsh had rebutted it. We also declined to address the court's alternative reasoning regarding the existence and constitutional implications of a *scienter* requirement, other than to note in passing that the constitutional question was properly analyzed under preemption principles rather than the dormant Commerce Clause. 241 Or App at 112 n 3.

In *Marsh II*, the Supreme Court reversed our decision and held that "the requisite reliance [under ORS 59.137] may be established by a plaintiff who purchases stock in an open and efficient market by means of the rebuttable presumption available under the fraud-on-the-market doctrine." 353 Or at 23. The court then remanded the case to us to address two unresolved issues that flowed from that holding: First, notwithstanding the availability of the fraud-on-the-market doctrine, should Marsh prevail because the evidence in the record successfully rebutted the presumption of reliance? 353 Or at 21 n 8. Second, is ORS 59.137 "unconstitutional because it does not contain a requirement that the defendant act with *scienter* to be found liable"? *Id.* at 23 n 10. As for the latter question, the Supreme Court agreed with our observation that the constitutional issue

implicated a preemption rather than dormant Commerce Clause analysis. *Id.* at 5 n 2.

## II. ANALYSIS

On remand, the parties have submitted supplemental briefing on both questions. As we will explain, we hold (1) that there are genuine issues of material fact with regard to whether Marsh rebutted the presumption of reliance; and (2) that, consistently with analogous federal law, a purchaser has the burden of proving *scienter* under ORS 59.137(1) and, for that reason, the statute is not preempted by federal law and does not violate the federal constitution. Accordingly, we reverse and remand for further proceedings.

### A. *Presumption of Reliance*

In granting Marsh's motion, the trial court explained that, "[e]ven if the presumption of reliance through the fraud on the market doctrine is accepted as Oregon law, here, defendants have clearly rebutted the presumption." The court explained that

> "the two financial advisors hired by OPERF who bought and sold MMC stock in 2003 and 2004 testified that they did not rely on MMC's alleged misrepresentations when purchasing stock for OPERF. [One of the advisors, Richard Rubenstein,] could not recall whether he had reviewed any of MMC's 10-K's or 10-Q's before purchasing shares. Records also show that hours after the New York Attorney General's announcement of civil and criminal charges against MMC in connection to bid rigging and contingent commissions, Mr. Rubenstein bought an additional 50,000 shares of MMC for OPERF. He continued to hold 300,000 shares on behalf of the fund. Steve Gorham, the other financial advisor who bought and sold MMC stock for the fund, bought MMC stock primarily because he was interested in Putnum, MMC's asset management business. Mr. Gorham's purchases had nothing to do with any statements made by Marsh. Neither advisor relied on Marsh's misrepresentations or omissions when purchasing MMC shares."

On appeal, the state argues that the trial court, by focusing on whether the state's advisors directly relied on Marsh's misrepresentations, turned the presumption on its head. The presumption, the state contends, is itself a

substitute for direct reliance in the case of a well-developed and efficient market, which sets the price for shares based on public disclosures. It is the efficient market, not the individual investors, who directly rely on the misstatements and omissions. Thus, "[t]his presumption is not rebutted by showing that an individual investor did not rely on any misrepresentations or omissions upon purchase," but rather, by a showing that "(1) there was not an efficient market for the company's stock, (2) the company's misrepresentation or omission was actually known to the market or purchaser, (3) the misrepresentation or omission had no effect on the market, or (4) that plaintiff purchaser would have acted no differently when [it] purchased the shares had it known the truth." (Citing *Basic*, 485 US at 248-49.)

Marsh, for its part, argues that the trial court's underlying premise was correct: The deposition testimony of the state's advisors, Rubenstein and Gorham, indicates that they did not actually rely on the integrity of the market price when purchasing MMC stock. Rubenstein, Marsh points out, testified that his investment strategy was based on his own valuation of securities rather than the market's valuation:

> "Q:  And so the places where you recommend a buy or effected a buy, when you had discretion, were those where your judgment about the stock was more optimistic than the market's judgment about the stock, correct?

> "A:  I would say yes."

Gorham similarly testified that he looked for undervalued stock:

> "Q:  So you try to buy large cap stocks that you believe might be undervalued by the market?

> "A:  That is correct."

According to Marsh, that testimony establishes that both Rubenstein and Gorham "did not rely on the 'integrity of the market price'"—"critical admissions by OPERF's money managers [that] necessarily 'sever the link' between MMC's alleged misrepresentations and OPERF's investment decisions."

We are not persuaded that either Rubenstein or Gorham disclaimed reliance on the market price. In fact, their testimony suggests the opposite: that they were "value investors" who considered the market price when determining whether to buy Marsh stock. On that point, the Supreme Court's reasoning in *Halliburton Co. v. Erica P. John Fund, Inc.*, ___ US ___, 134 S Ct 2398, 189 L Ed 2d 339 (2014), is instructive. In *Halliburton*, the defendants urged the Court to overrule *Basic* and its fraud-on-the-market presumption. Among other arguments, the defendants contested one of the premises "underlying the *Basic* presumption: the notion that investors invest in reliance on the integrity of the market price." *Halliburton*, ___ US at ___, 134 S Ct at 2410 (alterations, internal quotation marks, and citations omitted). The defendants pointed to classes of investors for whom "price integrity" is supposedly marginal or irrelevant—"[t]he primary example [being] the value investor, who believes that certain stocks are undervalued or overvalued and attempts to 'beat the market' by buying the undervalued stocks and selling the overvalued ones." *Id.*

The Supreme Court adhered to its decision in *Basic*, explaining that *"Basic* never denied the existence of such investors. * * * *Basic* concluded only that 'it is reasonable to presume that *most* investors—knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an unbiased assessment of the security's value in light of all public information." *Halliburton*, ___ US at ___, 134 S Ct at 2411 (quoting *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 US ___, 133 S Ct 1184, 1192, 185 L Ed 2d 308 (2013)) (emphasis in *Halliburton*). The Court then went on to explain that even "value investors" rely on the market price:

> "In any event, there is no reason to suppose that even Halliburton's main counterexample—the value investor—is as indifferent to the integrity of market prices as Halliburton suggests. Such an investor implicitly relies on the fact that a stock's market price will eventually reflect material information—how else could the market correction on which his profit depends occur? To be sure, the value investor 'does not believe that the market price accurately reflects public information at the time he transacts.' * * *

But to indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period. The value investor also presumably tries to estimate how undervalued or overvalued a particular stock is, and such estimates can be skewed by a market price tainted by fraud."

___ US at ___, 134 S Ct at 2410-11 (emphasis omitted).

Here, both Rubenstein and Gorham testified that they were looking for securities that were undervalued—a comparison that, as *Halliburton* explains, implicitly relies on the integrity of the market price in the sense relevant for the *Basic* presumption. Accordingly, we conclude that the trial court erred in ruling on this record that Marsh had successfully rebutted the presumption of reliance under the fraud-on-the-market doctrine.

B.  *Constitutional Challenge to ORS 59.137*

As noted above, the trial court also granted summary judgment to Marsh on the alternative ground that, as applied in this case, the lack of a *scienter* requirement in ORS 59.137 violates the Commerce Clause of the federal constitution. The state assigns error to that ruling, but the parties now dispute what exactly we are reviewing with regard to that assignment. In fact, Marsh no longer urges a Commerce Clause analysis, in light of what this court and the Supreme Court observed in *Marsh I* and *Marsh II*. In *Marsh I*, we explained:

"Throughout this litigation, the parties have presented the constitutional question as though it implicates only the so-called 'dormant' commerce clause. That clause has no bearing on defendant's argument that Oregon's laws conflict with federal law. An argument that a state law conflicts with federal law, intrudes into an exclusively federal subject, or stands as an impediment to achieving the purpose of the federal law is a *preemption* argument based on an asserted violation of the Supremacy Clause, Article VI of the United States Constitution, and applying an analysis to which neither party refers. *E.g., Pacific Gas & Elec. Co. v. State Energy Resources Comm'n*, 461 US 190, 103 S Ct 1713, 75 L Ed 2d 752 (1983). The dormant commerce clause, on the other hand, prohibits states from enacting laws that

impinge on the free trade values embodied in the Commerce Clause, where Congress has *not* exercised its commerce power—that is, when the power is present but 'dormant.'"

241 Or App at 112 n 3 (emphasis in original). The Supreme Court subsequently concurred with our observation:

"We agree with the Court of Appeals that the proper framework for analysis of the constitutional issues surrounding the *scienter* issue is preemption analysis, rather than Dormant Commerce Clause analysis, but we do not address the proper outcome of that preemption analysis in this opinion. We note this point only to assist the parties and the lower courts in addressing issues left to be resolved following remand from this court."

*Marsh II*, 353 Or at 5 n 2. In a subsequent footnote, the court stated:

"In the Court of Appeals, the state assigned error to the trial court's determination that ORS 59.137 is unconstitutional because it does not contain a requirement that the defendant act with *scienter* to be found liable. The parties addressed that determination in their briefing in the Court of Appeals. The Court of Appeals did not reach that issue, however, because it decided the case on the subconstitutional ground that the state failed to establish actual reliance under ORS 59.137. Neither party addressed the constitutional issue in their briefing before this court. Because we conclude that the Court of Appeals erred in determining that the state is required to establish actual reliance under the statute, we remand this case to the Court of Appeals. On remand, the Court of Appeals can reach and address the constitutional claim. *See ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.*, 349 Or 117, 150-51, 241 P3d 710 (2010)."

*Marsh II*, 353 Or at 23 n 10.

After the Supreme Court's remand, the parties filed supplemental briefing addressing the "constitutional question" that the Supreme Court remanded—and each takes a different view of what is properly before us. The state maintains that it "assigned error to the court's ruling that ORS 59.137 violates *the Commerce Clause*. That issue is before the Court." (Emphasis added.) The state contends that the issue that we and the Supreme Court flagged—a preemption question—was not raised by Marsh or addressed by the trial court, and it urges us to simply reverse the trial court's

ruling regarding the dormant Commerce Clause—a ruling that, according to the state, Marsh has "abandoned * * * in recognition of the fact that, as applied to Marsh in this case, ORS 59.137 does not regulate wholly extraterritorial conduct and does not impose undue burdens on it."

Marsh, on the other hand, focuses its supplemental briefing on the preemption question and asserts that it is "puzzle[d]" by the state's argument "about the Commerce Clause, which both this Court and the Oregon Supreme Court have decided is the wrong analysis." Marsh now argues that we should affirm the trial court's judgment because "either ORS 59.137 must contain a *scienter* requirement or it is preempted by federal law."

Were we writing on a clean slate, we might be inclined to agree with the state's narrow framing of the issue and simply address the merits of the trial court's reasoning regarding the dormant Commerce Clause, which was the subject of Marsh's motion and the basis for the trial court's ruling. However, given the procedural history of this case, the cues that we gave the parties about the proper analytical framework, the Supreme Court's remand instructions, and the briefing that is now before us, we conclude that it is appropriate to address the preemption issue (including the subconstitutional statutory construction question regarding *scienter*) as an alternative basis for affirmance. *See Outdoor Media Dimensions Inc. v. State of Oregon,* 331 Or 634, 659-60, 20 P3d 180 (2001) (describing the principle that permits us— as a matter of discretion—to affirm the ruling of the trial court on an alternative basis when certain conditions are met).[1]

The predicate of Marsh's preemption argument is that ORS 59.137 imposes liability without requiring the plaintiff to prove *scienter,* thereby differing from the corresponding right of action under Rule 10b-5, promulgated by the Securities and Exchange Commission under section 10(b) of the Securities and Exchange Act of 1934.[2] Thus, the

---

[1] As will become apparent, our analysis of the preemption question—in particular, whether ORS 59.137 requires a plaintiff to prove *scienter*—also resolves any question under the dormant Commerce Clause.

[2] The procedural posture of this case is further muddled by the fact that the parties' positions on this sub-issue run counter to the larger preemption question. That is, Marsh, whose preemption argument depends on the lack of

threshold question—whether a plaintiff is required to prove *scienter* under ORS 59.137—is one of legislative intent, which we resolve by applying the familiar methodology for construing statutes. *See State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009) (describing statutory interpretation framework in which the court examines text, context, legislative history, and, if necessary, resorts to maxims of construction).

Because the text of ORS 59.137 is best understood in its broader context, we begin with a brief overview of the Oregon Securities Law. The modern version of the Oregon Securities Law was enacted in 1967 and was patterned in many respects on the Uniform Securities Act. *See generally* Wendell M. Basye, *A Glimpse of Oregon's Blue Sky Legislation: The Revision of 1967*, 47 Or L Rev 403, 403 (1968) (citing Oregon State Bar Committee Report 25 (1966)). The Oregon Securities Law made it unlawful to, among other things, sell unregistered securities, ORS 59.055, and to engage in fraud or misstate material facts in connection with the purchase or sale of a security, ORS 59.135. The first three subsections of the latter statute, ORS 59.135, essentially mirrored text from the Uniform Securities Act that had been drawn from federal Rule 10b-5, which had been in effect since 1942:

> "It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security or the conduct of a securities business or for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise:

> "(1) To employ any device, scheme or artifice to defraud;

> "(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

a *scienter* requirement in ORS 59.137, argues that the statute should be interpreted to require *scienter*. The state, which could defeat a preemption (and dormant Commerce Clause) argument on the basis that the Oregon Securities Law includes the same *scienter* requirement as federal law, is arguing the contrary position. However, because we must resolve the statutory construction question as part of our analysis of the preemption arguments, we address the *scienter* question without regard to which party makes a particular argument.

"(3)   To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; or

"(4)   To make or file, or cause to be made or filed, to or with the commissioner any statement, report or document which is known to be false in any material respect or matter."

ORS 59.135 (1967).[3]

The Oregon Securities Law also afforded a private right of action to purchasers of securities against a seller. That express right of action, which was set forth in ORS 59.115 (1967), provided, in part:

"(1)   Any person who:

"(a)   Offers or sells a security in violation of the Oregon Securities Law or of any rule or order of the commissioner, or of any condition, limitation or restriction imposed upon a registration under the Oregon Securities Law; or

"(b)   Offers or sells a security *by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission,*

"is liable as provided in subsection (2) of this section to the person buying the security from him."[4]

(Emphasis added.)

---

[3] The text of Rule 10b-5 is quoted at 269 Or App at 46.

[4] Subsection (2) provided:

"The purchaser may recover, in addition to costs and reasonable attorney fees at trial and on appeal:

"(a) Upon tender of the security, the consideration paid for the security, and interest from the date of payment at the rate of six percent per annum, or at the rate provided in the security if the security is an interest bearing obligation, less any amount received on the security; or

"(b) If he no longer owns the security, damages in the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it and less interest on such value at the rate six percent per annum from the date of disposition."

ORS 59.115 (1967).

The private right of action under ORS 59.115(1)(b), however, was limited. It "previously established a cause of action only for purchasers of stocks damaged by misrepresentations made in direct, face-to-face securities transactions." *Marsh II*, 353 Or at 12. It did not reach security sales that were made in the open market—something that distinguished the Oregon cause of action from the implied right of action that had been recognized under Rule 10b-5 and section 10(b). *See Supt. Of Insurance v. Bankers L. & C. Co.*, 404 US 6, 13 n 9, 92 S Ct 165, 30 L Ed 2d 128 (1971) ("It is now established that a private right of action is implied under § 10(b).").

In 2003, the legislature enacted the provision at issue in this case, ORS 59.137, which expanded the private right of action under the Oregon Securities Law to, among other things, reach security sales that were made in the open market. That statute provides, in part:

"(1)  Any person who violates or materially aids in a violation of ORS 59.135(1), (2) or (3) is liable to any purchaser or seller of the security for the actual damages caused by the violation, including the amount of any commission, fee or other remuneration paid, together with interest at the rate specified in ORS 82.010 for judgments for the payment of money, unless the person who materially aids in the violation sustains the burden of proof that the person did not know and, in the exercise of reasonable care, could not have known of the existence of the facts on which the liability is based.

"(2)  Any person who directly or indirectly controls a person liable under subsection (1) of this section and every partner, limited liability company manager, including a member who is a manager, officer or director or a person occupying a status or performing functions of a person liable under subsection (1) of this section, is jointly and severally liable to the same extent as a person liable under subsection (1) of this section, unless the person who may be liable under this subsection sustains the burden of proof that the person did not know and, in the exercise of reasonable care, could not have known of the existence of the facts on which the liability is based."

Or Laws 2003, ch 631, § 4; Or Laws 2003, ch 786, § 3.

At the same time, the legislature amended ORS 59.115(1)(b) such that it now expressly refers to ORS 59.135. As amended, ORS 59.115(1)(b) now provides that a person is liable to a purchaser if the person:

> "(b)  [s]ells or successfully solicits the sale of a security *in violation of ORS 59.135(1) or (3) or by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."*

Or Laws 2003, ch 786, § 1 (emphasis added).

Notably, the right of action under ORS 59.137—unlike the amended version of ORS 59.115(1)(b)—does not include any type of "good faith" defense for a primary violator who makes a material misstatement. Rather, the statute reserves the "good-faith" defense for persons who are *secondary* violators. ORS 59.137(1) (providing a good-faith defense to a person who "materially aids in the violation"); ORS 59.137(2) (providing a good-faith defense to a person "who directly or indirectly controls a person liable under subsection (1) of this section and every partner, limited liability company manager, including a member who is a manager, officer or director or a person occupying a status or performing functions of a person liable under subsection (1)").

The parties disagree about the significance of that textual omission. The state argues that, by omitting any type of good-faith defense for primary violators, the legislature intended to create strict liability under ORS 59.137 for persons who make a material misstatement in connection with the purchase or sale of a security. Marsh, meanwhile, argues that there is a better explanation for why the legislature limited the good-faith defense to secondary violators: The legislature understood *scienter* to be an element of a "violation of ORS 59.135(1), (2) or (3)," eliminating the need for a good-faith defense for those persons. Although both interpretations of the statute are plausible at first blush, a closer examination of the text, context, and history of ORS

59.137 persuades us that the 2003 legislature intended a "violation of ORS 59.135(1), (2) or (3)" to refer to conduct that was committed with *scienter*, in conformity with well-established federal law.

As noted above, the text of ORS 59.135(1), (2), and (3) is identical to paragraphs (a), (b), and (c) of Rule 10b-5, which provides:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> "(a)  To employ any device, scheme, or artifice to defraud,
>
> "(b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> "in connection with the purchase or sale of any security."

17 CFR § 240.10b-5. By 2003, it had been understood for nearly 30 years that, to establish a violation of those provisions of Rule 10b-5 for purposes of a private right of action, a plaintiff was required to prove that the conduct was committed with *scienter. See Ernst & Ernst v. Hochfielder*, 425 US 185, 193, 96 S Ct 1375 47 L Ed 2d 668 (1976) (holding that a private cause of action for damages will not lie "under § 10(b) and Rule 10b-5 in the absence of any allegation of '*scienter*'—intent to deceive, manipulate, or defraud"). In *Ersnt & Ernst*, the Supreme Court explained that, "[v]iewed in isolation," the text of Rule 10b-5(b) and (c) "could be read as proscribing, respectively, any type of material misstatement or omission, and any course of conduct, that has the effect of defrauding investors, whether the wrongdoing was intentional or not." 425 US at 212. However, that reading, the Court held, "cannot be harmonized with the administrative history of the Rule, a history making clear that when the Commission adopted the Rule it was intended to apply *only to activities that involved scienter.*" *Id.*

(emphasis added). More importantly, the Court explained, the authorizing statute, section 10(b) of the Securities and Exchange Act of 1934, was understood to prohibit intentional wrongdoing:

> "When a statute speaks so specifically in terms of manipulation and deception, and of implementing devices and contrivances—the commonly understood terminology of intentional wrongdoing—and when its history reflects no more expansive intent, we are quite unwilling to extend the scope of the statute to negligent conduct."

425 US at 214. Since *Ernst & Ernst*, there has been no dispute that violations of Rule 10b-5 require proof of *scienter*. *E.g., Aaron v. SEC*, 446 US 680, 691, 100 S Ct 1945, 64 L Ed 2d 611 (1980) ("In our view, the rationale of [*Ersnt & Ersnt*] ineluctably leads to the conclusion that scienter is an element of a violation of § 10(b) and Rule 10b-5, regardless of the identity of the plaintiff or the nature of the relief sought.").

The text of ORS 59.135(2), like Rule 10b-5(b), refers to "misstatements" in the context of conduct such as fraud, deceit, "scheme[s]," and "artifice[s] to defraud"—terms that are reasonably understood as acts beyond mere negligence or mistake. ORS 59.137(1) groups all of that conduct together, imposing liability on any person who "violates or materially aids in a violation of ORS 59.135(1), (2) or (3)." The collective treatment of those three provisions, without drawing any distinction between misstatements and fraud, and without providing any good-faith defense for misstatements, suggests to us that the legislature understood violations of all three provisions to refer to similar types of conduct involving *scienter. Cf.* ORS 59.115(1)(b) (treating misstatements differently from violations of ORS 59.135(1) and (3), and providing a good-faith defense for innocent misrepresentations).

Indeed, the contrast between ORS 59.115(1)(b) and ORS 59.137 provides a strong contextual clue that the legislature did not understand the latter statute to impose civil liability based on innocent misrepresentations. If ORS 59.137 were understood to reach innocent misrepresentations, it would expand a seller's liability beyond what

is contemplated in ORS 59.115(1)(b). That is, a seller would be entitled to the good-faith defense under ORS 59.115(1)(b) but would nonetheless be liable under ORS 59.137. The state has not offered any persuasive explanation for why the legislature would have insulated sellers from liability for innocent misrepresentations made *directly to the purchaser* while, at the same time, imposing strict liability for innocent misrepresentations to any purchaser or seller.

The legislative history of ORS 59.137 confirms our understanding that "violations of ORS 59.135(1), (2) or (3)" were understood to include an element of *scienter*. Both we and the Oregon Supreme Court have observed that "'[t]he testimony before committees considering the bills that ultimately became ORS 59.137 *** contains repeated statements that the target of the statute is "fraud" or "fraudulent" conduct; nearly every person who testified used one or another of those terms.'" *Marsh II*, 353 Or at 14 (quoting *Marsh I*, 241 Or App at 116-17). And, in addition to referring to fraudulent conduct, bill sponsors and legislators repeatedly stated that the effect of the bills was to create consistency between state and federal securities law—references that, in this context, unambiguously refer to actions under Rule 10b-5, which applies in the case of "open market" transactions. *See Marsh II*, 353 Or at 13 (quoting the Staff Measure Summary for Senate Bill (SB) 609-A presented to the Senate Committee on Business and Labor on May 2, 2003) ("'This bill permits a public fund or other investor to state a claim even when the securities were purchased in the open market. *SB 609-A also creates consistency between Oregon law and corresponding federal laws.'*" (Emphasis added.)). Those references convince us that the legislature intended ORS 59.137 to provide a cause of action for the same type of conduct that gives rise to a private right of action under Rule 10b-5.

The legislative history of ORS 59.137 also supports our view that the limited "good-faith" defense in ORS 59.137 was intended to prevent strict liability for *secondary* violators, not to imply strict liability for *primary* violators. One of the proponents of the language that became the good-faith defense explained that it "gives a due diligence defense and

a right of contribution to those who are considered secondarily liable. Those are secondary participants *in a fraud committed by a primary violator.*" Tape Recording, House Committee on Rules and Public Affairs, House Bill (HB) 3666, August 14, 2003, Tapes 120 and 121 (statement of Scott Schorr) (emphasis added). That is, the focus was to avoid the "unintended consequence" of imposing absolute liability on secondary violators. Tape Recording, Senate Rules Committee, HB 3666, August 21, 2003, Tape 126, Side A (testimony of Joe Arellano); *see generally Prince v. Brydon,* 307 Or 146, 151, 764 P2d 1370 (1988) ("The defense against strict liability [under ORS 59.115(3)], in short, was to be a showing of ignorance, not the professional role of the person who renders material aid in the unlawful sale."); *Anderson v. Carden,* 146 Or App 675, 683, 934 P2d 562, *rev den,* 326 Or 68 (1997) ("[T]he liability of the nonseller participant under ORS 59.115(3) is predicated on the violation of the seller. The nonseller participant becomes liable under ORS 59.115(3) because it has 'participated or materially aided' in the sale, not because it has violated any law.").

Indeed, another private proponent of the bill, Robert Stoll, was asked to respond to concerns that the bill, as amended, would actually eliminate "strict liability" for securities violations in Oregon. Stoll explained that the changes retained that type of liability—and perhaps broadened it—*for initial offerings* through changes to the scope of *ORS 59.115 and ORS 59.127,* statutes that provide for a rescission-based measure of damages. Tape Recording, House Committee on Rules and Public Affairs, HB 3666, August 14, 2003, Tapes 120 and 121 (testimony of N. Robert Stoll). The implication from that testimony, and the discussion that followed about "participant" liability under those statutes, is that ORS 59.137, by contrast, was never intended to impose absolute liability for fraud-on-the-market claims.[5]

---

[5] The state points out that an early iteration of SB 609 included language that would have added new sections to ORS 59.135, including a provision that "[a]ny person who with knowledge or with recklessness or gross negligence violates or participates or materially aids in a violation of subsection (1) of this section shall be liable to the purchaser, seller or owner of the security for the actual damages sustained * * *." According to the state, "[t]hat element was deleted from subsequent versions of the bill, including the bill ultimately enacted," thereby indicating that the legislature "contemplated, but ultimately rejected, imposing a mental state requirement for a cause of action under ORS 59.137." We are not

In sum, we are persuaded that the legislature understood the phrase "violation of ORS 59.135(1), (2) or (3)" to refer to acts that are committed with *scienter*. Thus, we hold that a plaintiff bringing an action under ORS 59.137 must prove the element of *scienter* in the same way that plaintiffs must under the corresponding federal laws, section 10(b) and Rule 10b-5.[6]

Our conclusion in that regard undercuts Marsh's preemption argument as well as its dormant Commerce Clause argument, both of which were predicated on the assumption that federal securities laws require proof of an element that ORS 59.137 does not. We therefore reject Marsh's request to affirm on those constitutional grounds and instead reverse and remand for further proceedings.[7]

Reversed and remanded.

---

convinced that anything helpful to our task can be gleaned from that text in the original bill, considering that the bill underwent wholesale revisions to its structure and content, and the legislative record does not explain why that particular language, among other provisions, did not appear in later versions.

Moreover, we are not aware of anything in the legislative history of ORS 59.137 that suggests that the legislature intended to create a kind of strict liability that encompasses innocent misstatements, thereby expanding a seller's liability for misstatements beyond what is contemplated in ORS 59.115(1)(b). *See* 269 Or App at 47-48.

[6] Our holding is limited to ORS 59.137 and does not affect the right of action under ORS 59.115(1)(b).

[7] Marsh also argues, for the first time on appeal, that we should affirm the trial court's grant of summary judgment on the ground that the state failed to plead the element of *scienter*. Suffice it to say that, had Marsh made that argument below, and assuming for the sake of argument that it is correct (which the state disputes), it is conceivable, if not likely, that the trial court would have allowed the state to amend its complaint to allege *scienter*. Accordingly, we decline to affirm the grant of summary judgment on that alternative basis.